Jose M. Maneiro ALCALDE, Libellant

v.

THE Steamship LOS MAYAS, her engines, etc., in rem, and Moa Nediera, S.A., owners and/or bareboat charterers, in personam, Respondents.

Julius CURTIS, Libellant,

v.

EDISON STEAMSHIP CORPORATION, Respondent.

Nos. 8010, 8079.

United States District Court
E. D. Virginia,
Norfolk Division.
June 28, 1960.

874

Howell, Anninos & Daugherty (Henry E. Howell, Jr.), Norfolk, Va., Sacks & Sacks (Stanley E. Sacks), Norfolk, Va., for libellants.

Vandeventer, Black, Meredith & Martin (Walter B. Martin, Jr.), Norfolk, Va., Seawell, McCoy, Winston & Dalton (John W. Winston), Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

The above causes, not consolidated for trial but involving substantially similar questions at this stage of the proceedings, stand on motions to quash the service of process under special appearances duly noted.

In Alcalde, the libel was filed on February 16, 1959, after the Los Mayas had left the Port of Hampton Roads. Process was served on the manager of Lavino Shipping Company, contended by libellant to be the agent for the respondent, Moa Nediera, S. A., owner of said vessel. The facts are not in dispute. The vessel was in port between January 8, 1959, and January 12, 1959, during which time Lavino acted as the ship's husbanding agent under directions from Time & Freight Chartering Corporation, general agents for the vessel in New York. All contacts with respect to the ship were between Lavino and Time & Freight Chartering. Libellant sustained the injuries of which he complains while a seaman aboard the vessel in the New York harbor on January 4, 1959. The Los Mayas thereafter left New York for Norfolk, and libellant was removed from the vessel on January 9, 1959, following which he was taken to the United States Public Health Service Hospital at Norfolk. Lavino guaranteed the payment of the hospital bill. On January 16, 1959, the Immigration Service served its form I-259 upon Lavino, advising Lavino that landing permit I-95 previously issued to libellant had been revoked as libellant had been transferred to the hospital for medical treatment and was unable to depart on the Los Mayas. By letter dated February 3, 1959, Lavino requested the Immigration Service to issue a parole to libellant in order to permit libellant to travel to New York and join another ship of the same ownership on or about March 3, 1959, with Lavino guaranteeing to pay all expenses in behalf of the owner.

On February 5, 1959, Lavino submitted to Time & Freight its statement of disbursements covering its services as husbanding agent, but excluding all items paid or guaranteed for the injured libellant. By invoices dated February 11, February 27, and March 17, Lavino submitted to Time & Freight a bill covering hospital treatment, taxi service, maintenance expense, telephone, and the cost of libellant's transportation from Norfolk to Madrid, Spain. Arrangements for libellant's departure were made by Lavino, the Immigration Service, and proctors for libellant and respondent. Lavino also conferred with proctors for libellant as to the amount of maintenance and requested a medical report.

In summary, at the time of the service of process upon Lavino on February 17, 1959, the sole activity of Lavino was the continuation of maintenance and cure, as well as arrangements for voluntary departure, with respect to the injured libellant left in Norfolk following the sailing

of the vessel on January 12, 1959. In all other respects the services of the husbanding agent (or subagent) were closed as of the date of the rendition of Lavino's invoice to Time & Freight dated February 5, 1959. There is no contention that the Los Mayas visited any Virginia port from time to time, nor that the owner otherwise did business in Virginia or designated any agent upon whom process could be served.

In Curtis, the American S. S. Edison Mariner was owned and operated by Edison Steamship Corporation. The corporation has no office, agents, or employees within the State of Virginia, and has designated no agent upon whom process may be served. It owns and operates two vessels which, prior to January 20, 1959, had not called upon any port in Virginia. On the latter date the Edison Mariner arrived at Norfolk for the purpose of being placed out of service in a laid-up status. She remained in that status until March 26, 1959, at which time she signed on a crew, including libellant, for a coastwise voyage to New York where she was to load cargo. Libellant alleges that he was injured on March 27 while the vessel was at sea. Upon arrival at New York, and after loading, the crew, including libellant, signed foreign articles on April 3, 1959. The vessel has not returned to Norfolk since March 26, 1959. Prior to the departure of the vessel from Norfolk, it had purchased certain stores and provisions to be placed on board and, as indicated, at least a portion of the crew had been hired in Virginia.

The libel in Curtis was filed on December 21, 1959, pursuant to the provisions of the Jones Act, 46 U.S.C.A. § 688. Service was allegedly effected upon the Secretary (Clerk) of the State Corporation Commission on December 28, 1959. Proctors for libellant obtained information as to the ownership of the vessel from Dichmann, Wright & Pugh, husbanding agent for the ship while it was in Norfolk between January 20, 1959, and March 26, 1959. Proctors thereafter advised respondent by letter dated October 7, 1959, of their representation of libellant's interest. Hearing nothing from respondent, one of libellant's proctors telephoned New York and discussed the matter with one Desiato of respondent corporation. Desiato acknowledged receipt of the letter and stated that he would pay maintenance to libellant; he also inquired as to how he could dispose of the claim without reporting it to his "P & I Club". Thereafter a crew pay voucher was sent to libellant's proctors, but was returned as unsatisfactory to proctors. Later a receipt in the amount of $64 was forwarded, and approximately one week thereafter a check in the sum of $64 was received by libellant by mail from New York. On November 11, 1959. libellant's proctors advised Desiato that proctors would waive their interest as attorneys in the maintenance claim, and were only interested in the personal injury claim. Receipts for maintenance were sent to respondent in advance at the respondent's insistence. Following a phone call by libellant's proctor to Desiato another maintenance check was received. Several telephone calls ensued, receipts were forwarded, but payments of maintenance were delayed. This action was then instituted. Subsequently, pursuant to another telephone call, receipts in series were sent to respondent covering the period from November 28, 1958, through January, 1960, in order to expedite maintenance payments. The law firm of Seawell, McCoy, Winston & Dalton then appeared representing respondent, and so advised proctors for libellant.

In interpreting the language of the process statute of a state, the federal courts are bound by the decisions of the state courts. Westcott-Alexander, Inc. v. Dailey, 4 Cir., 264 F.2d 853; Iliff v. American Fire Apparatus Co., Inc., 4 Cir., 277 F.2d 360. We turn, therefore, to a consideration of § 8–60 of the Code of Virginia, 1950, as amended effective July 1, 1958. This statute provides that if foreign corporations doing business or transacting affairs in Virginia have no registered agent upon whom process may be served, then, and in that event, any process or notice may be

served upon *any agent* of the corporation in the city or county in which he resides or in which his place of business is, or upon the Clerk of the State Corporation Commission.

■ Section 8–60 was amended effective July 1, 1958. The new statute supplemented the prior act by adding the words "or * * * transacting affairs" to the phrase "doing business". Respondents point out that "transacting affairs" is synonymous with the phrase "conduct affairs" under § 13.1–265 of the Code of Virginia. Libellants suggest that the amendment was intended to reach corporations transacting any affairs in Virginia sufficient to give a nexus to sustain jurisdiction.

Assuming arguendo the correctness of libellants' contention, we do not believe that the facts herein presented furnish the essential nexus to retain jurisdiction. The question was not specifically raised in the briefs submitted in Iliff v. American Fire Apparatus Co., Inc., supra, wherein Judge Soper refers to the amended statute providing for foreign corporations "doing business * * * or * * * transacting affairs", but there has now been a judicial interpretation of § 8–60 of the Code of Virginia which is persuasive in that it apparently applies the principles of law which existed prior to the amendment.

■ The affairs transacted in Virginia were isolated instances too remotely associated with the constructive presence of respondents to permit the exercise of jurisdiction. In Alcalde, such affairs were limited to Lavino's duty to see to the welfare of the injured seaman, arrange for his maintenance and cure, and attend to his repatriation. Indeed, it could be said that Lavino, as the husbanding agent, would possibly be subjected to a fine imposed by Immigration authorities had it failed to arrange for repatriation of an injured foreign crewman left in this country after his vessel had departed. In Curtis, the nexus of jurisdiction is even more remote.

■ To support the view advanced by libellants in these cases would subject foreign corporations to service of process in Virginia by the mere payment of maintenance and cure to seamen temporarily or permanently within this State. Seamen are injured throughout the world and, frequently at their request, they are returned to their homes for continued hospitalization or convalescence. As outpatients they are clearly entitled to maintenance until they attain the maximum state of cure. We see no distinction between providing for maintenance and cure through a local firm or agent for this specific purpose, and otherwise sending an individual from a foreign state to attend to these duties. In each instance they are isolated activities which do not suggest that the foreign corporation is actually or constructively present within the State of Virginia.

This Court has held in prior cases that service of process upon a husbanding agent while the vessel is in port, and thereafter until the husbanding agent submits an invoice for the many details attended to by the agent occasioned by the vessel's visit to Virginia, constitutes "doing business * * * or * * * transacting affairs" within Virginia. Admittedly there are many details handled by the husbanding agent for the foreign corporate operator of the vessel which are completed after the vessel has sailed. Extending the concept of "doing business * * * or * * * transacting affairs" to the point where the husbanding agent submits his final invoice for the *regular* activities of the vessel's business does no violence to the theory of actual or constructive presence within the state. But to further hold that the actual or constructive presence within Virginia continues for many months, and perhaps years, after the vessel has left merely because an injured seaman remains in a hospital, or is otherwise brought to this port for continued hospitalization or convalescence, offends the sense of fair play and justice as reflected in International Shoe Co. v. State of

Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95.

■ Certainly it cannot be said that Lavino's activities in Alcalde, or the owner's negotiations in Curtis, were as great as Culbert's activities in behalf of his principal in Iliff, supra. The husbanding agent is authorized to act on a ship-by-ship basis; there is no continuity of service; the systematic operation is lacking. Under like principles the activities in Curtis were too isolated in character.

■ It may be successfully argued that Virginia, by its amendment to § 8–60 of the Code of Virginia, has intended to make foreign corporations amenable to service of process in Virginia in all situations where it can constitutionally do so. We do not have before us the situation in which the vessel, or other ships operated by respondents, visited Virginia ports with any degree of regularity. In such instances service upon the Clerk of the State Corporation Commission is sufficient personal service and, in this regard, we look not only to the frequency of visits but also to the number of vessels owned by the foreign corporation, the purpose of its visits, the business done while here, the seasonal nature of loadings and discharges, as well as other factors too numerous to mention.

■ To hold with libellants here would effectively reverse the decision in Iliff, a case decided since the amendment to § 8–60, and would put in a different light the many decisions of the Fourth Circuit touching upon like questions. Cannon v. Time, Inc., 4 Cir., 115 F.2d 423; Eastern Livestock Co-Op. Marketing Ass'n v. Dickenson, 4 Cir., 107 F.2d 116. It would likewise disregard many Virginia authorities of similar import. Carnegie v. Art Metal Const. Co., 191 Va. 136, 60 S.E.2d 17; Tignor v. L. G. Balfour & Co., 167 Va. 58, 187 S.E. 468.

The foregoing precludes the necessity of an extended discussion of the constitutional issue which would result if libellants were to prevail. In short, the business done or transactions conducted by the respondents in providing for the maintenance and cure of injured seamen in Virginia was not of such a character and extent as to warrant the inference that the foreign corporations had subjected themselves to the laws of the State. It is interesting to note that the amendment to § 8–60 provides no more than what has heretofore been supplied by judicial pronouncement in Virginia as, in Carnegie, supra, the language used is "business done or transactions conducted". [191 Va. 136, 60 S.E.2d 23]

The respective motions to quash the service of process will be sustained.